UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Decker, Malveaux and Senior Judge Annunziata


MISTY P. WATKINS

v.      Record No. 0020-18-3

CITY OF ROANOKE DEPARTMENT
  OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
JUNE 26, 2018


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
J. Christopher Clemens, Judge

(Shannon J. Jones, on brief), for appellant.

(Daniel J. Callaghan, City Attorney; Heather P. Ferguson, Assistant
City Attorney; Sarah Jane Newton, Guardian *ad litem* for the minor
children, on brief), for appellee.


Misty P. Watkins (mother) appeals the order terminating her parental rights to her three

children and approving the foster care goals of adoption. Mother argues that the circuit court erred

by finding that (1) there was "clear and convincing evidence satisfying the statutory factors in

Virginia Code Section 16.1-283(C)(2);" and (2) "there was clear and convincing evidence that

termination of [mother's] residual parental rights was not in the child[ren]'s best interests and that

the child[ren] be placed for adoption." Upon reviewing the record and briefs of the parties, we

conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the

circuit court. See Rule 5A:27.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother and Johnathan Watkins (father) are the biological parents to K.W. and M.W., who were born in 2012 and 2013, respectively. On August 13, 2015, the Roanoke City Department of Social Services (the Department) received a child protective services (CPS) complaint, alleging domestic violence and inadequate supervision. Mother and father separated, and mother went to a domestic violence shelter. Both mother and father filed for a protective order against each other and filed petitions for custody of the children. The Department offered co-parenting counseling, individual counseling, a mediation session, a referral to TAP Head Start for child care, and housing assistance. The CPS investigation was founded for Level one, physical neglect.

Initially, on September 18, 2015, the Roanoke City Juvenile and Domestic Relations District Court (the JDR court) awarded temporary shared custody to mother and father; however, on December 16, 2015, the JDR court found that the children were being abused or neglected and ordered the removal of K.W. and M.W. The Department sought removal after father and his girlfriend tested positive for methamphetamines and amphetamines, and the girlfriend also tested positive for marijuana. Mother did not inform the Department of father's substance abuse, so the Department thought that mother was protecting father at the expense of the children's safety. The Department also indicated that mother worked full-time and did not have satisfactory child care arrangements. In addition, the Department expressed concern that mother "made questionable decisions regarding the people that she associates with" because she was romantically involved with a convicted sex offender. The Department investigated the maternal and paternal grandmothers as possible relative placements, but determined that they were not suitable caregivers.

Once the children were placed in foster care, the Department offered additional services to mother. The Department required mother to maintain contact with the Department, attend intensive individual counseling, attend co-parenting sessions, comply with psychiatric and medication management services, comply with housing assistance offered and demonstrate the ability to maintain housing for a period of time, submit to random drug screens, attend substance abuse treatment, and participate in visitations with the children.[1]

In March 2016, mother and father resumed living together, and after the Department approved of the home, it arranged for home visits between the children and the parents. The parents were making progress, and on June 9, 2016, the Department placed K.W. and M.W. back into mother and father's care on a trial home placement. Later in June 2016, mother gave birth to J.W.[2] On July 23, 2016, the police requested that the Department come to mother and father's home because there was a domestic violence incident between the parents while the children were present. As a result of the incident, the Department placed K.W. and M.W. back into foster care, and J.W. was placed with her maternal grandmother. When K.W. entered foster care, she had bruises and marks on her body that were consistent with the use of a belt. The Department investigated the matter, and it was founded for Level one, physical abuse from an unknown abuser.

Mother and the maternal grandmother had a "dysfunctional" relationship. Mother told the Department that she did not think that the maternal grandmother was "in a position" to care for J.W. On October 24, 2016, mother informed the Department that she was no longer agreeable to J.W. being placed with the maternal grandmother. Consequently, the Department

---

[1] While mother was pregnant with J.W., the Department acknowledged that it would be unlikely that mother would be prescribed any psychiatric medications.

[2] Father is not the biological parent to J.W.

placed J.W. in foster care. On November 1, 2016, the JDR court entered the preliminary removal order and found that J.W. was abused or neglected.

The Department referred mother to counseling. The Department recommended co-parenting counseling sessions, but mother and father did not complete the services. Mother attended individual counseling with New Horizons from January through June 2016, and then stopped going. In October 2016, mother moved to North Carolina and was hospitalized for three days for depression, anxiety, and suicidal thoughts. After her release from the hospital, mother attended counseling and received medication management. Mother expressed concern to the Department about taking the medication because she did not like the side effects; however, the Department was unaware of whether a doctor told mother that she no longer needed her medication. Mother advised the Department that while in North Carolina, she was working, taking parenting classes, studying for her GED, attending NA meetings, and attending counseling. Mother consistently visited with the children.

Mother's housing was unstable after the Department placed the children in foster care again in July 2016. Mother lived in at least three different homes with the children's paternal aunt, a friend, and a friend's mother, until she started residing with her father in June 2017.

In addition to issues about mother's mental health and housing situation, the Department was concerned that mother was using illegal drugs. The Department asked mother to submit to random drug screens. On January 15, 2016, mother tested positive for marijuana and benzodiazepines. On February 26, 2016, mother asked that she not take the test because it would have come back positive for marijuana. On April 4, 2016 and May 13, 2016, mother tested negative for all substances. On May 9, 2017, mother tested positive for marijuana.

- 4 -

In April 2017, mother obtained a protective order against father. She also had been charged with grand larceny, but at the time of the circuit court hearing, the criminal case had not been resolved.

The JDR court terminated mother's parental rights and approved the foster care goal of adoption. Mother appealed to the circuit court.[3]

The parties appeared before the circuit court on November 1, 2017. The Department presented evidence that J.W. was doing very well in foster care and had no special needs. However, K.W. and M.W. had "significant mental health and emotional issues." Both K.W. and M.W. required therapy, and K.W. also received speech therapy. The foster care mother testified that after the visits with mother were extended in July 2017, K.W. and M.W., but especially K.W., displayed more fear and anxiety. Then, on September 12, 2017, after a visit with mother, K.W. had "a panic of bugs crawling on her," which escalated. On the way home, the foster care mother was forced to pull off the road five times to calm down K.W. The foster mother requested that mother's visits and phone calls stop, and once that happened, the children displayed less anxious behavior.

At the conclusion of the Department's evidence, mother made a motion to strike, which the circuit court denied. Mother testified that since April 2017, she had been going to counseling on a weekly basis. She explained that according to the psychiatrist, she no longer needed medication. She provided a certificate showing that she had completed an eight-week parenting class. Mother explained that she did not complete the co-parenting sessions because father refused to participate. Mother testified that since the children were removed, she had obtained

---

[3] The JDR court also terminated father's parental rights to K.W. and M.W. and the unknown father's parental rights to J.W. They appealed to the circuit court, but neither father appeared at the circuit court hearing. The Department asked that the fathers' appeals be withdrawn. The circuit court granted the Department's motion and withdrew the fathers' appeals.

her driver's license and a vehicle. She was working full-time and living with her father in North Carolina.

After hearing the evidence and argument, the circuit court terminated mother's parental rights pursuant to Code § 16.1-283(B) and (C)(2) and approved the foster care goal of adoption. On December 12, 2017, the circuit court entered an order memorializing its rulings. This appeal followed.

ANALYSIS

Mother argues that the circuit court erred by terminating her parental rights and approving the foster care goal of adoption.[4] She asserts that it was not in the children's best interests to terminate her parental rights pursuant to Code § 16.1-283(B) and that she complied with the statutory requirements of Code § 16.1-283(C)(2).

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)). "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" Id. (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation

---

[4] With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265 n.3, 616 S.E.2d 765, 769 n.3 (2005).

of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which [s]he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

At the time of the circuit court hearing on November 1, 2017, K.W. and M.W. had been in foster care for almost two years, and J.W. had been in foster care for one year. The Department presented evidence to prove that mother had not substantially remedied the problems that led to the children being placed in foster care. In 2015, the Department became involved with the family due to concerns about substance abuse, domestic violence, and the children's safety. The JDR court ultimately removed the children from mother and father's custody because of drug use and safety concerns. However, the parents showed signs of improvements, so the Department placed the children back with mother and father for a trial home placement in June 2016. The trial home placement lasted approximately one month. The Department had to remove the children because of a domestic violence incident between mother and father. In April 2017, there was another domestic violence incident between mother and father, and mother obtained a protective order against father.

Between July 2016 and November 2017, mother had lived in at least four different residences. At the time of the circuit court hearing, she was living with her father and did not have her own residence. Mother stopped going to counseling in June 2016, and in October 2016, mother was hospitalized for depression, anxiety, and suicidal thoughts. Mother also tested positive for marijuana in May 2017. Mother did not complete parenting classes until August 2017.

Although mother had shown improvements, she was not in a position to care for the children. The Department presented evidence that K.W. and M.W. had special needs and required therapy, whereas J.W. was doing very well. The circuit court explained that it could not simply look at a "snapshot" of mother right now, but had to consider the "evidence taken as a whole" since the children entered foster care. After hearing all of the evidence, the circuit court found that it was in the best interests of the children to terminate mother's parental rights. Mother had not substantially remedied the conditions that led to the children being placed in foster care. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). Considering the entire record, the circuit court did not err in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (the Court affirmed termination of

parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection).  Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.